IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

SIMPSON-LITTMAN CONSTRUCTION, INC.,

    Plaintiff,

v.           CIVIL  ACTION  NO.  3:09-0240

ERIE INSURANCE PROPERTY & CASUALTY
INSURANCE COMPANY, a corporation,

    Defendant.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are cross-motions for summary judgment in the instant action (Docs. 17 & 19).  For the following reasons, the Court **DENIES** Plaintiff Simpson-Littman Construction, Inc.'s motion (Doc. 20) and **DENIES** Defendant Erie Insurance Property and Casualty Insurance Company's motion (Doc. 19).

### Background

This case concerns whether Defendant Erie Insurance Property and Casualty Insurance Company ("Erie") is obligated to defend and indemnify Plaintiff Simpson-Littman Construction, Inc. ("Simpson-Littman") in a negligence and breach of contract action pending in the Circuit Court of Cabell County, West Virginia.  Simpson-Littman is a West Virginia corporation engaged in the construction of homes in Cabell County, with its principal place of business in Barboursville, West Virginia.  Erie is a Pennsylvania corporation engaged in the business of providing insurance and authorized to do business in West Virginia.  From September 15, 1996, until September 15, 2005, Simpson-Littman maintained a Fivestar General Contractors Policy with Erie ("Policy No. Q33

65200125").  The policy provided, in relevant part:

> **PROPERTY DAMAGE LIABILITY –**
> **COVERAGE E**
>
> We will pay for damage because of **bodily injury** or **property damage** for which the law holds **anyone we protect** responsible and which are covered by **your** policy.  We cover only **bodily injury** and **property damage** which occurs during the policy period.  The **bodily injury** or **property damage** must be caused by an **occurrence** which takes place in the covered territory.
>
> We will pay any additional sums or perform any additional acts or services that are explicitly covered under WHAT WE ALSO PAY, and nothing else.  *Ins. Policy* (Doc. 17-4), at 18 (emphasis in original).

Simpson-Littman did not maintain any coverage with Erie after September 15, 2005.

On or about April 29, 1999, Simpson-Littman entered into a contract with Merlin Bush and his wife (now deceased) to build their home in Cabell County, for the total price of $309,765.00. Construction of the home began, thereafter, and was completed in June 2000.[1]  Merlin Bush moved into the then-new home in or about July 2000.

While building the Bush home, Simpson-Littman engaged the services of two subcontractors, Jimmy Smith d/b/a Smith Construction ("Smith Construction") and Tri-State Masonry, to prepare the home-site and lay the foundation.  Smith Construction performed work related to the preparation and construction of the home-site, including general dozer, backhoe, excavation, and soil preparation services.  Tri-State Masonry performed work related to the building of the home's foundation, including the supply, delivery, and laying of block.

At some time after he moved into his new home, in July 2000, Merlin Bush noticed damage to the residence.  He noticed cracks in the interior walls; cracks in the brick exterior; cracks in the

---

[1]In May 2000, overruns to the April 1999 construction contract brought the total price for the Bush home to $333,240.13.

2

block and foundation; gaps and separation between the walls and floors; unlevel and sagging floors;

an inability to close or lock certain doors and windows; and other structural defects.  There is a

factual dispute concerning when Mr. Bush first discovered these defects.  However, it is undisputed

that, in the summer of 2007, Mr. Bush hired a professional engineer, Robert L. Wolfe, to investigate

the problems.  According to Mr. Wolfe, who conducted a structural inspection of the residence "over

the course of several weeks," *Wolfe Report* (Docs. 21-1 & 17-3), the damage to the home owned by

Mr. Bush is the result of problems in the original site development, including a failure to properly

compact the soil and fill material underlying the home's foundation, which is causing significant

settlement of the footings on the front side of the residence.   *See id.*; *Wolfe Affidavit* (Doc. 21-1),

at ¶ 4.  In a report dated October 15, 2007, Mr. Wolfe describes the damage as follows:

> The original site development appears to have included excavation of the hillside on the rear
> south elevation of the property, with fill material along the front north elevation.
> Photographs of the original site development verify this opinion and also indicate that the
> footings of the front of the house apparently were placed on this fill material.  Significant
> settlement of the footings along the entire front of the house has occurred as a result of this
> construction, indicating that the fill material was not adequately compacted to provide
> sufficient soil bearing pressure for the loads imposed by the weight of the house.  Soil
> analysis from core drilling samples along the perimeter edge of the exterior foundation walls
> also validate this opinion and support the conclusion that underpinning of the existing
> foundations is required before more serious structural damage occurs. Settlement cracks are
> visible in the brick veneer in several locations along the front and side exterior elevations
> of the house, as well as cracks in the drywall partitions of the interior living spaces.  These
> cracks vary in size and are open as much as ½" in many instances.  The interior cracks in the
> drywall partitions are associated with settlement of the footings, as well as framing
> deficiencies and oversights on the part of the contractor for original construction.
>
> ＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊＊
>
> All of the damage that is described above is the obvious result of construction errors on the
> part of the original contractor for construction and could have been avoided if certain
> precautions had been applied and the architect had been consulted about alternative pier
> locations and bearing points for the floor framing.  The construction of foundation walls and
> footings on fill material is often necessary in residential construction, but the fill material in
> this instance was not placed as 'engineered fill' or compacted in accordance with certain
> engineering principles available through consulting engineering services.  Essentially, if the
> contractor had located the footings on bedrock and had positioned the piers properly with

steel bearing plates as bearing points, the house would not be experiencing the settlement and cracking that now exists. *Wolfe Report* (Docs. 21-1 & 17-3).

Attached to the report, Mr. Wolfe provides an explanation of the structural repairs that will be required to repair the home, as well as copies of the logs and results of the soil borings performed at the residence, in the course of his inspection.

On or about October 28, 2008, Merlin Bush filed a complaint against Simpson-Littman in the Circuit Court of Cabell County, alleging negligence and breach of contract related to the construction of his home ("the Underlying Action"). Simpson-Littman provided Erie with timely notice of the complaint. On or about December 19, 2008, Erie denied coverage, on the grounds that the occurrence of the alleged property damage occurred after the expiration of Simpson-Littman's insurance policy with Erie. On or about February 6, 2009, Merlin Bush filed an amended complaint in the Underlying Action. The amended complaint added subcontractors Smith Construction and Tri-State Masonry as defendants, alleged negligence (faulty workmanship) on the part of the subcontractors, and claimed negligent supervision on the part of Simpson-Littman. Simpson-Littman provided Erie with timely notice of the amended complaint. Again, Erie denied coverage, in a certified letter dated March 5, 2009. In the March 2009 letter, Erie noted that Policy No. Q33 6520012 did not provide coverage for improper workmanship and based its denial of coverage on the fact that "the claim being asserted against [Simpson-Littman] did not arise out of an occurrence of property damage that took place during the policy period, and as defined by the policy." *March 5, 2009 Letter* (Doc. 19-7).

On March 18, 2009, Simpson-Littman filed this action. Simpson-Littman seeks a declaration that the claims and allegations made against it in the Circuit Court of Cabell County fall within the effective policy period and provisions of Policy No. Q33 6520012. Accordingly, Simpson-Littman

4

requests a declaration that Erie is obligated to defend and indemnify it in the Underlying Action. On December 31, 2009, Simpson-Littman moved for summary judgment. On January 8, 2010, Erie cross-moved, agreeing that there are no genuine issues of material fact, but contending that it, not Simpson-Littman, is entitled to judgment as a matter of law.

## Standard of Review

Rule 56©) of the Federal Rules of Civil Procedure provides that summary judgment is proper if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56©).* "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). In other words, the availability of summary judgment turns on whether a proper jury question exists in a pending case. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59 (1970).

In considering a motion for summary judgment, the Court draws any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson*, 477 U.S. at 249. Nonetheless, the nonmoving party must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor," *Anderson*, 477 U.S. at 256, and, if the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, an evidentiary showing sufficient to establish that element, then summary judgment will be granted.

5

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("In our view, the plain language of Rule 56©)

mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial.").

"When considering motions from both parties for summary judgment, the court applies the

same standard of review and so may not resolve genuine issues of material fact." *Monumental*

*Paving & Excavating, Inc. V. Penn. Manufacturers' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir.

1999). The court must review each motion separately, on its own merits, and determine whether

either party deserves judgment as a matter of law. *Id.*; *Rossignol v. Voorhaar*, 316 F.3d 516, 523

(4th Cir. 2003). "When considering each individual motion, the court must take care to resolve all

factual disputes and any competing, rational inferences in the light most favorable to the party

opposing that motion." *Rossignol*, 316 F.3d at 523 (internal quotations omitted).

## Analysis

Where jurisdiction is based upon diversity of citizenship, West Virginia law governs the

interpretation of an insurance policy at issue in a declaratory judgment action. *First Fin. Ins. Co.*

*v. Crossroads Lounge, Inc.*, 140 F.Supp.2d 686, 694 (S.D. W. Va. 2001). Further, "[d]etermination

of the proper coverage of an insurance contract when the facts are not in dispute is a question of

law." Syl. Pt. 2, *Tackett v. Am. Motorists Ins. Co.*, 584 S.E.2d 158 (W. Va. 2003) (quoting Syl. Pt.

1, *Tennant v. Smallwood*, 568 S.E.2d 10 (W. Va. 2002)).

In West Virginia, "insurance policies are to be strictly construed against the insurer." *Burr*

*v. Nationwide Mut. Ins. Co.*, 359 S.E.2d 626, 630-31 (W. Va. 1987); *see also* Syl. Pt. 4, *Nat'l Mut.*

*Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987); *id.* at Syl. Pt. 5. A West Virginia

court is "obliged to give an insurance contract that construction which comports with the reasonable expectations of the insured." *Burr,* 359 S.E.2d at 631.  This means "that the *objectively* reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored[.]" Syl. Pt. 9, *Murray v. State Farm Fire & Cas. Co.*, 509 S.E.2d 1 (W. Va. 1998) (quoting *McMahon & Sons*, 356 S.E.2d 488 at Syl. Pt. 8) (emphasis supplied).   Nonetheless, it is well-settled that insurance contracts should be interpreted according to the plain, ordinary meaning of the language used.  Syl. Pt. 2, *Glen Falls Ins. Co. v. Smith*, 617 S.E.2d 760 (W. Va. 2005). Therefore, the doctrine of strict construction generally only applies if and when an insurance policy contains an ambiguous term.[2] *Id.* at Syl. Pt. 4 (citing Syl. Pt. 5, *Hambric v. Doe*, 499 S.E.2d 619 (W. Va. 1997)).

"[A]n insurer's duty to defend is tested by whether the allegations in the plaintiff's complaint are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." *Aetna Cas. & Surety Co. v. Pitrolo*, 342 S.E.2d 156, 160 (W. Va. 1986); *see also Tackett*, 584 S.E.2d 158 at Syl. Pt. 4 (same); *State Bancorp, Inc. v. U.S. Fid. & Guar. Ins. Co.*, 483 S.E.2d 228, 233 (W. Va. 1997) (same); *Bruceton Bank v. U.S. Fid. & Guar. Ins. Co.,* 486 S.E.2d 19, 23-24 (W. Va. 1997) (same).   "There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage."  *Id.*  Rather, "the duty to defend an insured is generally broader than the obligation to provide coverage." *State Bancorp*, 483 S.E.2d at 233 (quoting *Horace Mann Ins. Co. v. Leeber,* 376 S.E.2d 581, 584 (W. Va. 1988))

---

[2]"Whenever the language of an insurance policy provision is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning, it is ambiguous."  *Glen Falls,* 617 S.E.2d 760 at Syl. Pt. 3 (quoting *Hambric*, 499 S.E.2d 619 at Syl. Pt. 5) (internal citation omitted).

(applying the general principle that ambiguity in an insurance policy be construed in favor of the insured to the question of an insurer's duty to defend); *see also Tackett*, 584 S.E.2d 158 at Syl. Pt. 5 (same).  "[I]f part of the claims against an insured fall within the coverage of a liability insurance policy and part do not, the insurer must defend all of the claims, although it might eventually be required to pay only some of the claims."  *Id.* (quoting *Leeber,* 376 S.E.2d at 584).  "[A] liability insurer need not defend a case against the insured if the alleged conduct is entirely foreign to the risk insured against," however.  *Id.* (quoting *Leeber,* 376 S.E.2d at 584).

In this action, Plaintiff moves for summary judgment "on the grounds that there are no material facts in dispute that (1) the Policy provides coverage for the work performed by the Plaintiff's subcontractors; (2) the property damage alleged by Merlin Bush occurred during the Policy period; and (3) the property damage alleged by Merlin Bush was caused by an 'occurrence.'"  *See Pl.'s Resp. in Opp'n* (Doc. 21), at 1-2.  Erie contends, however, that no coverage is available under Policy No. Q33 6520012 because: (1) the alleged loss falls outside of the policy period, and (2) the period for coverage for completed operations hazard claims is the same as for the policy as a whole.  *See generally Def.'s Mot. for Summ. J.* (Doc. 19); *Def.'s Resp. in Opp'n* (Doc. 20).

In light of Erie's response, it is clear that the ultimate issue with regard to the cross-motions is the issue of timing – i.e., whether the property damage complained of in the Underlying Action occurred during the policy period.[3]  Before the question of timing is addressed, however, the Court must review the coverage provided in Policy No. Q33 6520012 to determine whether, if it occurred

---

[3]Erie also raises an issue concerning the period for coverage of the completed operations hazard provision.  However, as will be discussed *infra*, the completed operations hazard coverage period is the same as the coverage period for the policy as a whole.  Consequently, the dispositive issue remains whether the damage Merlin Bush complains of, in the Underlying Action, occurred during Simpson-Littman's policy period.

during the policy period, the property damage complained of by Merlin Bush would be covered under the insurance contract.  This procedure follows three steps.  First, the Court examines the facts of Simpson-Littman's claim to see if the policy makes an initial grant of coverage.  If so, the Court then examines the policy's exclusions to see whether any of them preclude coverage.  Lastly, if a particular exclusion applies, the Court will look to see whether any exception to that exclusion reinstates coverage.  Once the Court has conducted each of these steps, it will consider the question of timing.[4]

I.      *Establishing Coverage Under the Policy – The initial grant of coverage and the "your work" exclusion*

Policy No. Q33 6520012 is an occurrence-based commercial general liability ("CGL") policy which contains "completed operations hazard" coverage and a "your work" exclusion with a subcontractor exception.[5]  The initial grant of coverage, relevant here, is found in Coverage E. Coverage E reads as follows:

**PROPERTY DAMAGE LIABILITY –**

---

[4]As will be discussed *infra*, the question of timing is relevant to the initial grant of coverage under Coverage E, for, the property damage must occur during the policy period to be covered under the policy.  However, because the question of timing is the dispositive issue here, it will be addressed last.

[5]"We do not cover under ... Property Damage Liability (Coverage E) ... 5. **property damage** to **your work** arising out of **your work** or any portion of it but only with respect to the **completed operations hazard**.  This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."  *Ins. Policy* (Doc. 17-4), at 21 (emphasis in original).  "'**Your work**' means: 1. work or operations performed by you or on your behalf; 2. materials, parts or equipment furnished in connection with such work or operations.  **Your work** includes: 1. warranties or representations made at any time with respect to the fitness , quality, durability, or performance of your work; and 2. the providing of or failure to provide warnings or instructions."  *Id.* at 7 (emphasis in original).

**COVERAGE E**

We will pay for damage because of **bodily injury** or **property damage** for which the law holds **anyone we protect** responsible and which are covered by **your** policy. We cover only **bodily injury** and **property damage** which occurs during the policy period. The **bodily injury** or **property damage** must be caused by an **occurrence** which takes place in the covered territory.

We will pay any additional sums or perform any additional acts or services that are explicitly covered under WHAT WE ALSO PAY, and nothing else. *Ins. Policy* (Doc. 17-4), at 18 (emphasis in original).

The "completed operations hazard" coverage is explained in the definitions section. The pertinent

provision reads as follows:

"**Completed operations hazard**" includes all **bodily injury** and **property damage** occurring away from premises **you** own or rent arising out of **your work** that has been completed or abandoned.

**Your work** will be considered completed at the earliest of the following times:

  1.   when all of the work called for in **your** contract has been completed;

  2.   when all of the work to be done at the job site has been completed, if **your** contract calls for work at more than one job site;

  3.   when that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work which may need further service, maintenance, correction, repair or replacement, but which is otherwise complete, will be considered completed.

The **completed operations hazard** does not include **bodily injury** or **property damage** arising out of:

  1.   the transportation of property, unless the **bodily injury** or **property damage** arises out of a condition in or on a vehicle not owned or operated by **you**, and that condition was created by the loading or unloading of that vehicle by an **Insured**;

  2.   the existence of tools, equipment not installed, or materials abandoned or

unused.  *Id.* at 4 (emphasis in original).

"Your work" is defined as:

> "**Your work**" means:
>
>> 1.   work or operations performed by **you** or on **your** behalf;
>>
>> 2.   materials, parts or equipment furnished in connection with such work or operations.
>
> **Your work** includes:
>
>> 1.   warranties or representations made at any time with respect to the fitness, quality, durability, or performance of your work; and
>>
>> 2.   the providing of or failure to provide warnings or instructions.  *Id.* at 7 (emphasis in original).

The insured, Simpson-Littman, qualifies as "anyone we protect" under the policy.  The policy period is established in the "**Declarations**" section of the contract and, for the purposes of the cross-motions, ran from September 15, 1998, to September 15, 2005.  The "covered territory" includes the United States of America and, consequently, the State of West Virginia.  *See generally Ins. Policy* (Doc. 17-4).

> a.   *The Initial Grant of Coverage Under Coverage E*

According to the plain language of Policy No. Q33 6520012, to establish coverage under the initial grant provided in Coverage E, Simpson-Littman must show that it will be held responsible for "property damage," which occurred during the policy period and was caused by an "occurrence," as defined by the policy.[6]  In other words, the insured must: (1) identify the specific property damage it will be held responsible for and show that this damage is covered under the policy; (2) identify

_____

[6]The Underlying Action concerns property damage, not bodily injury.  As a result, this Opinion addresses only that portion of Policy No. Q33 6520012's coverage.

the occurrence – as defined by the policy – that caused the relevant property damage; and (3) show that the property damage complained of occurred during the policy period.

        I.        *"Property Damage"*

In the definitions section, Policy No. Q33 6520012 provides as follows:

"**Property damage**" means:

    1.    physical injury to or destruction of tangible property including loss of its use. All such loss of use shall be deemed to occur at the time of the physical injury that caused it;

    2.    loss of use of tangible property which is not physically injury or destroyed. All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it.  *Ins. Policy* (Doc. 17-4), at 6 (emphasis in original).

It is undisputed that there is property damage to Merlin Bush's home, as defined in Policy No. Q33 6520012.  Further, the parties agree that the structural defects to Merlin Bush's home, which are complained of in the Underlying Action, constitute "physical injury to or destruction of tangible property[.]" *See Pl.'s Resp. in Opp'n* (Doc. 21), at 3; *Def.'s Mot. for Summ. J.* (Doc. 19), at 7.  As a result, the first type of property damage identified in Policy No. Q33 6520012 exists here.

        ii.        *"Occurrence"*

Next, the Court looks to the question of whether an "occurrence," as defined by the policy, exists.  The definitions section of Policy No. Q33 6520012 reads as follows:

"**Occurrence**" means an accident, including continuous or repeated exposure to the same general, harmful conditions.  *Ins. Policy* (Doc. 17-4), at 6 (emphasis in original).

The term "accident" is not defined in Policy No. Q33 6520012.  Controlling West Virginia case law provides a definition for "accident" in the context of a standard CGL policy, however.  In *State Bancorp*, an action brought by a bank and its loan officers for reimbursement from their insurer for

costs incurred in defending claims of breach of contract, outrage, civil conspiracy, and violation of banking laws, brought by borrowers, the West Virginia Supreme Court of Appeals held:

> Ordinarily, "accident" is defined as "an event occurring by chance or arising from unknown causes." *Webster's New Collegiate Dictionary* 7 (1981). An "accident" generally means an unusual, unexpected and unforseen event.... An accident is never present when a deliberate act is performed unless some additional unexpected, independent and unforeseen happening occurs which produces the damage.... To be an accident, both the means and the result must be unforeseen, involuntary, unexpected, and unusual. *State Bancorp,* 483 S.E.2d at 234 (quoting *Harrison Plumbing & Heating, Inc. v. New Hampshire Ins. Group*, 681 P.2d 875, 878 (1984)); *see also Corder v. William W. Smith Excavating Co.* 556 S.E.2d 77, 82 n. 12 (W. Va. 2001) (quoting *State Bancorp* and applying the same definition for "accident" in the context of an occurrence-based CGL policy).[7]

Based on the definition of "accident" provided in *State Bancorp*, the relevant question here is whether the damage to Merlin Bush's home was (and is) caused by an event that was unusual, unexpected, and unforseen. The damage to Merlin Bush's home is caused by the on-going settlement of the soil and fill material underneath the residence. This sinking is the result, allegedly, of the negligence of subcontractors Smith Construction and/or Tri-State Masonry. As a result, the more specific issue the Court must address is whether the settlement of soil and fill (the result) and the faulty performance of the subcontractors (the means) were unforseen, involuntary, unexpected, and unusual. *See id.*

Several West Virginia cases have examined whether and when faulty workmanship may result in an "occurrence" sufficient to trigger coverage under a CGL policy. As a general rule, "[p]oor workmanship, standing alone, does not constitute an 'occurrence' under the standard policy definition of this term as an 'accident including continuous or repeated exposure to substantially the

---

[7] In both *State Bancorp* and *Corder*, an "occurrence" in the CGL policy at issue was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See State Bancorp,* 483 S.E.2d at 232; *Corder,* 556 S.E.2d at 81. The same language is used here.

same general harmful conditions.'" *Corder*, 556 S.E.2d at Syl. Pt. 2; *see also Webster Co. Solid Waste Auth. v. Brackenrich & Assocs., Inc.*, 617 S.E.2d 851, 857 (W. Va. 2005) (same). CGL policies are liability policies, and "[a] liability insurance policy, unlike a builder's risk policy, is designed to indemnify the insured against damage to other persons or property caused by his work or property and is not intended to cover damage to the insured's property or work completed by him." *Erie Ins. Prop. & Cas. Co. v. Pioneer Home Improvement, Inc*. 526 S.E.2d 28, 31 (W. Va. 1999)(quoting Syl. Pt. 2, *McGann v. Hobbs Lumber Co.,* 145 S.E.2d 476 (1965)). In short, a liability policy is not a performance bond. *Id.* at 32. It does "not insure the work or workmanship which the contractor or builder performs." *Id.* Instead, it protects the insured for tort liability. *Id.* at 33 ("[T]he coverage is for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.") (quoting Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations-What Every Lawyer Should Know*, 50 Neb. L.Rev. 415, 441 (1971)).

Said differently,"[CGL policies do] not cover an accident of faulty workmanship but rather faulty workmanship that causes an accident." *Id.* (quoting *Weedo v. Stone-E-Brick, Inc.,* 405 A.2d 788, 796 (N.J. 1979)). As a result, in faulty workmanship cases, there must be something more than the flawed performance to trigger coverage. There must be an unexpected or unforseen event. In other words, as explained in *Corder*, "[t]he key to determining the existence of an 'occurrence' is whether a separate act or event or happening occurred at some point in time that lead to the [property damage complained of] or whether the [property damage] is tied to the original acts of repair performed by [the insured]." *Corder*, 556 S.E.2d at 84. If the property damage is tied to the original

14

acts performed by the insured, then, despite any negligence, there is no coverage.  This is because there is no "accident" and thus no "occurrence."  However, if the damage is tied to a "separate act or event or happening," then the separate act or event, when unexpected or unusual, may qualify as an "occurrence."  This "occurrence," if it triggered damage during the policy period, will trigger coverage.

In the instant case, the property damage complained of in the underlying complaint includes cracks in the interior walls of Merlin Bush's home; cracks in the brick exterior; cracks in the block and foundation; gaps and separation between the walls and floors; unlevel and sagging floors; an inability to close or lock certain doors and windows; and other structural defects.  According to Professional Engineer Robert L. Wolfe, this damage "is the obvious result of construction errors on the part of the original contractor for construction," because "the fill material in this instance was not placed as 'engineered fill' or compacted in accordance with certain engineering principles available through consulting engineering services." *Wolfe Report* (Docs. 21-1 & 17-3).  Put simply, a failure to use "engineered fill" (the means) caused  the settling of the soil and fill material below his foundation (the result), which in turn has caused the damage to Merlin Bush's home.  Therefore, for liability purposes, the important question is whether this result (the soil settlement) and the means (subcontractor negligence) were unforseen, involuntary, unexpected, and unusual from the perspective of Simpson-Littman.  In other words, taken together, do they constitute an "accident" necessary to establish the "occurrence" required for coverage?

This Court finds, conclusively, that the answer to this question is yes.  The settlement of the soil and fill below Merlin Bush's home, which is (and was) caused by Smith Construction and/or Tri-State Masonry's negligence, is an "occurrence" under Policy No. Q33 6520012.  There are two

cases cited by Simpson-Littman that lead the Court to this conclusion: *American Family Mutual Insurance Company v. American Girl, Inc.*, 673 N.W.2d 65 (Wis. 2004), and *French v. Assurance Company Of America*, 448 F.3d 693 (4th Cir. 2006).

Although not controlling, the Court looks to *American Family* first.  The relevant facts in *American Family* are similar to the pertinent facts here.  A general contractor was hired to complete a construction project (a large distribution center warehouse).  Subsequently, the general contractor hired a subcontractor to conduct an analysis of the soil conditions at the site, for the purposes of site preparation.  *American Family*, 673 N.W.2d at 71.  The subcontractor determined the soil conditions were poor and recommended a preparation technique called "rolling surcharging" to compress the soil and achieve the necessary density to support the weight of the warehouse.  The site was prepared according to the subcontractor's advice.  The building was completed and occupied, in or around August 1994.  *Id.*  Soon thereafter, the warehouse began to sink.  Over the next several years, the building sunk approximately 18 inches.  *Id.* at 71-72.  The sinking resulted in the buckling of the building.  Steel supports were deformed, the floor cracked, and sewer lines shifted.  By 1999, engineers determined that the building was no longer safe for occupancy.  Thus, in late 1999 or early 2000, the warehouse was dismantled.  *Id.*

After consultation, a geotechnical expert hired in *American Family* concluded that the sinking of the warehouse was the result of the soil subcontractor's negligence.  *Id.* at 72.  The general contractor was sued for the damage and sought coverage under a standard CGL policy.  The CGL policy at issue in *American Family* covered liability for "property damage" that resulted from an "occurrence."  "'Occurrence' [was] defined as 'an accident, including continuous or repeated exposure to substantially the same general harmful conditions.'"  *Id.* at 75-76.  Using *Webster's*

*Dictionary*, the term "accident" was defined as "an event or condition occurring by chance or arising from unknown or remote causes." *Id.* at 76. It was something unexpected. *Id.* In *American Family* the Wisconsin Supreme Court addressed whether the damage to the warehouse, caused by the settlement of soil, resulted from an "occurrence" under the CGL policy. The State court held as follows:

> The damage to the [warehouse] occurred as a result of the continuous, substantial, and harmful settlement of the soil underneath the building. [The subcontractor's] inadequate site-preparation advice was a cause of this exposure to harm. Neither the cause nor the harm was intended, anticipated, or expected. We conclude that the circumstances of this claim fall within the policy's definition of "occurrence."[8] *Id.*

The *American Family* finding supports this Court's conclusion that there is an "occurrence" here. Just as neither the cause nor the harm in *American Family* were intended, anticipated, or expected, neither the subcontractors' negligence nor the sinking of Merlin Bush's home were intended, anticipated, or expected here. Thus, taken together, the negligence and the settling constitute an "occurrence" under Policy No. Q33 6520012.

This determination is supported by the Fourth Circuit's decision in *French*. In *French*, the

---

[8]In response to the insurer's argument that the claim did not stem from an "occurrence" as defined in the policy because the claim is for breach of contract, and "the CGL is not intended to cover contract claims arising out of the insured's defective work or product," *id.*, the Supreme Court of Wisconsin stated, "there is nothing in the basic coverage language of the current CGL policy to support any definitive tort/contract line of demarcation for purposes of determining whether a loss is covered by the CGL's initial grant of coverage. 'Occurrence' is not defined by reference to the legal category of the claim." *Id.* at 77. The Wisconsin court explains that, "[i]f, as [the insurer] contends, losses actionable in contract are never CGL 'occurrences' for purposes of the initial coverage grant, then the business risk exclusions are entirely unnecessary. The business risk exclusions eliminate coverage for liability for property damage to the insured's own work or product-liability that is typically actionable between parties pursuant to the terms of their contract, not in tort." *Id.* at 78. This reasoning is applicable here because West Virginia courts, like many states, are explicit in that pure contract claims are not covered by CGL policies. However, as stated in *American Family* there is nothing in the language of Policy No. Q33 6520012 that precludes coverage here. Moreover, the existence of a "your work" exclusion suggests a loss actionable in contract has the potential to qualify as an "occurrence."

17

Fourth Circuit cited *American Family* favorably and heavily.   The Frenches hired a general contractor to build a single-family home.  Subsequently, the general contractor hired a subcontractor to install a synthetic stucco system known as Exterior Insulating Finishing System ("EIFS") on the exterior of the home.  *French*, 448 F.3d at 696.  After completion of the home, a Certificate of Occupancy was issued and the couple moved in, in December 1994.  Approximately five years later, in late 1999, the couple discovered extensive moisture and water damage to the home.  *Id.*  They further discovered that the moisture and water damage was the result of defects in the EIFS, installed by the subcontractor.

The damage at issue in *French* occurred to the structure and walls of the home, which were otherwise non-defective upon completion.  The general contractor was sued for damage and  sought coverage for the damage under multiple standard CGL policies.  *Id.*  The policy language at issue in *French* was very similar to the language relevant here.  The general contractor's insurers were liable for "property damage" caused by an "occurrence," as defined in the policies.  *Id.* at 697.  "An 'occurrence' was defined as "an accident, including continuous or repeated exposure to the same general harmful conditions."  *Id.* at 698.

When determining whether an "occurrence" existed in *French*, the Fourth Circuit divided the property damage to the Frenches' home into two categories: (1) the defective EIFS exterior, and (2) the damage to the non-defective structure and walls of the home directly caused by the moisture intrusion through the defective exterior.  *Id.* at 703.  With regard to the first category of damage, the Fourth Circuit turned to Maryland case law for guidance.  *See Lerner Corp. v. Assurance Co. Of Am.*, 707 A.2d 906 (Md. 1998).  In *Lerner*, a faulty workmanship case, the Maryland Court of Special Appeals held "that the plaintiffs' liability to correct [a] building's defective facade did not

18

result from 'the happening of an accident' but resulted 'simply from its failure to satisfy its obligations under their contract,' and therefore, did not constitute an 'occurrence' under any of the CGL policies at issue." *French*, 448 F.3d at 702 (quoting *Lerner*, 707 A.2d at 911).  The Fourth Circuit, therefore, found that the first category of damage in *French* was not covered under the relevant CGL policies, because "just as the defective application of the building's stone facade in *Lerner* did not constitute an 'accident,' and, therefore, not an 'occurrence' under the materially similar CGL policies at issue in *Lerner*, so does the defective application of the EIFS exterior to the Frenches' home not constitute an 'accident,' and therefore, not an 'occurrence' under the 1986 ISO CGL Policies." *Id.* at 703.

With respect to the second category of damage, however, the Circuit Court reached a different conclusion.  There, it framed the issue as follows: "[W]hether, under Maryland law, the 1986 ISO CGL Policies provide a general contractor liability coverage for the cost to remedy property damage to the contractor's otherwise nondefective work-product caused by a subcontractor's defective workmanship?"  Then, the Fourth Circuit held: "The Supreme Court of Wisconsin's thoughtful opinion in *American Family Mutual Insurance Company v. American Girl, Inc.*, 268 Wis.2d 16, 673 N.W.2d 65 (Wis. 2004), and *dicta* in *Lerner* conclusively persuade us that the answer to this question is yes." *Id.* at 703.   In the Circuit Court's words:

> In *American Family*, the Supreme Court of Wisconsin considered a materially analogous set of facts.  The court found coverage under the 1986 version of the ISO CGL policy to indemnify a general contractor for the costs to remedy property damage to a warehouse (*i.e.*, the sinking of the building's foundation and buckling and cracking of the building's structure necessitating the building being declared unsafe and torn down) caused by faulty site-preparation advice by a soil engineer subcontractor.  With respect to the initial grant of coverage, the court held that the property damage to the warehouse was the result of an accident, *i.e.*, the settling of the soil, and therefore, an "occurrence" within the meaning of the 1986 ISO CGL policy form.

*****************

[T]here is no evidence that [the general contractor] subjectively expected or intended that the nondefective structure and walls of the Frenches' home would suffer damage from moisture intrusion.  Indeed, there does not appear even to be an allegation that [the general contractor] expected or intended its subcontractor [] would defectively install the EIFS exterior on the Frenches' home.  Accordingly, as was the case of the sinking soil in *American Family*, the moisture intrusion into the nondefective structure and walls of the Frenches' home was an accident, and therefore, an 'occurrence' under the initial grant of coverage of the 1986 ISO CGL Policies[.]  *Id.* at 704 (internal citations omitted) (emphasis in original).

The reasoning applied in *French* and *American Family* applies here.  In *American Family*, the harm the warehouse was exposed to was "the continuous, substantial, and harmful settlement of the soil underneath the building."  *American Family*, 673 N.W.2d at 76.  This harm was caused by the subcontractor's negligence.  Neither this cause, nor the harm, was expected.  As a result, there was an "occurrence."  *Id.*  In *French*, the harmful condition the home was exposed to was the moisture intrusion.  The intrusion was caused by the installation of defective siding on the part of a subcontractor.  Again, neither this cause, nor the harm, were expected or intended by the insured.  As a result, the Fourth Circuit found an "occurrence" under the CGL policy existed.  *French*, 448 F.3d at 704.  The same can be said here.  Here, the harmful condition Merlin Bush's home is exposed to is the settlement of the soil and fill under the home.  This harm is the result of faulty workmanship on the part of Smith Construction and/or Tri-State Masonry.  There is no evidence that the structure or walls of Merlin Bush's home were defective upon completion.  Moreover, there is no evidence that either the cause, or the harm to Merlin Bush's home, was expected or intended by Simpson-Littman.  As a result, relying on *American Family* and *French*, this Court finds that the settlement of the soil and fill material under Merlin Bush's home, caused by subcontractor

negligence, is an "accident," and thus an "occurrence," under Simpson-Littman's CGL policy.[9]

Before the Court will discuss whether the damage caused by the "occurrence," relevant here, occurred during the policy period (the final element necessary to establish coverage under the initial grant), it will review Policy No. Q33 6520012's "your work" exclusion.

### c.     The "Your Work" Exclusion and Its Subcontractor Exception

The initial grant of coverage in a CGL policy is broad.  Therefore, insurers limit their exposure to risk through specific exclusions.  *See American Family*, 673 N.W.2d at 74.  One of the exclusions that defines the standard CGL policy is the "business risk," "your work," "your product," or "your property" exclusion.  *Id.*  "Business risk" exclusions, such as the "your work" exclusion, prevent policy holders from converting their liability insurance into a guaranty of their work product (i.e., into a form of business warranty).[10]  *Id.*  Consequently, the exclusions are the key mechanisms

---

[9]This conclusion is consistent with the West Virginia Supreme Court's decision in *Corder*.  In *Corder*, the State court held that coverage for claims based on faulty performance on the part of an insured were not compensable because such claims were, effectively, for breach of contract.  Therefore, there was no "accident" or "occurrence" under a standard CGL policy.  Despite finding no coverage, however, the *Corder* court explained when and how coverage may be provided under a CGL policy in the case of faulty workmanship.  According to the Supreme Court, "[t]he key to determining the existence of an 'occurrence' is whether a separate act or event or happening occurred at some point in time that lead to the [property damage] or whether the [property damage] is tied to the original acts of repair performed by [the insured]."  *Corder*, 556 S.E.2d at 84.  Said differently, the *Corder* court explained that an "occurrence" under a CGL policy would require something more than simple negligence on the part of the contracting party.  It requires there be an extra, unintended, or unexpected act in the chain of causal events.  In *French*, that unexpected act was the moisture intrusion suffered by the non-defective structure and walls.  In *American Family*, that act was the sinking of the soil and fill underneath the warehouse.  The same unexpected and unintended act (the settlement of soil and fill) exists here.  Thus, an "occurrence" is present.

[10]*See also Pioneer*, 526 S.E.2d at 32-33 ("At least one commentator has noted that the distinction between an 'occurrence of harm risk' and a 'business risk' is 'critical to understanding a comprehensive general liability insurance policy.'  An 'occurrence of harm risk' is a risk that a person or property other than the product itself will be damaged through the fault of the contractor.  A 'business risk' is a risk that the contractor will not do his job competently,

which prevent CGL policies from being transformed into performance bonds.  *See Pioneer*, 526

S.E.2d at 32-33.

Policy No. Q33 6520012 contains a "your work" exclusion.  The exclusion reads as follows:

We do not cover under ... Property Damage Liability (Coverage E) ... 5. **property damage** to **your work** arising out of **your work** or any portion of it but only with respect to the **completed operations hazard**.  This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.  *Id.* at 21 (emphasis in original).

"Your work" is defined as follows:

"**Your work**" means:

1.      work or operations performed by **you** or on **your** behalf;

2.      materials, parts or equipment furnished in connection with such work or operations.

**Your work** includes:

1.      warranties or representations made at any time with respect to the fitness, quality, durability, or performance of your work; and

2.      the providing of or failure to provide warnings or instructions.  *Id.* at 7 (emphasis in original).

The "your work" exclusion precludes coverage for faulty workmanship on the part of Simpson-

Littman.  However, because it contains a subcontractor exception, it does not preclude coverage for

damage arising out of faulty workmanship on the part of Smith Construction or Tri-State Masonry.

Prior to 1986, the "on behalf of" language used in the definition of "your work" in the

standard CGL policy "was interpreted to mean that no coverage existed for damage to a

---

and thus will be obligated to replace or repair his faulty work.  The distinction between the two is critical to understanding a CGL policy.  A CGL policy covers an occurrence of harm risk but specifically excludes a business risk.") (quoting *Peerless Ins. Co. v. Brennon*, 564 A.2d 383, 386 (Me. 1989)).

subcontractor's work, or for damage resulting from a subcontractor's work." *French*, 448 F.3d at 701. "Many contractors were unhappy with this state of affairs, since more and more projects were being completed with the help of subcontractors." *Id.* (quoting *American Family*, 673 N.W.2d at 82-83). As a result, "beginning in 1976, an insured under the 1973 ISO CGL policy form could pay a higher premium to obtain a broad form property damage endorsement ... which effectively eliminated the 'on behalf of' language and excluded only coverage for property damage to work performed by the named insured." *Id.* The subcontractor exception was added directly to the body of the "your work" exclusion, in the form ISO CGL policy, in 1986. *Id.*

Consistent with the 1986 revisions to the form ISO CGL policy, the "your work" exclusion in Policy No. Q33 6520012 is expressly subject to a subcontractor exception. As a result, so long as the property damage for which coverage is sought is otherwise covered under the general grant of coverage in the policy (i.e., it is caused by an "occurrence" and occurs during the policy period), damage to or arising out of a subcontractor's work is compensable under Policy No. Q33 6520012. Accordingly, because the damage to Merlin Bush's home was caused by an "occurrence," so long as this damage occurred during the policy period, by operation of the subcontractor exception to the "your work" exclusion, there will be coverage for the damage under Policy No. Q33 6520012.[11]

---

[11]As a note, in *French*, the Fourth Circuit found "[f]inally and significantly, our holding ... that ... coverage exists under the 1986 ISO CGL Policies for the cost to remedy the damage to the nondefective structure and walls of the Frenches' home ... gives effect to the subcontractor exception to the "Your Work" exclusion in these policies. ... 'It is a recognized rule of construction that a contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause or phrase so that a court does not case out or disregard a meaningful part of the writing.' *Bausch & Lomb, Inc. v. Utica Mutual Ins. Co.*, 330 Md. 758, 625 A.2s 1021, 1033 (1993). The very existence of the "Your Work" exclusion and the history of subconstractor exception to that exclusion provide us solid confirmation that our holding with respect to the nondefective structure and walls of the Frenches' home is correct. As the Court of Appeals of Kansas expressly quoted with approval: 'If the policy's exclusion for damage to the insured's work contains a proviso stating that the exclusion is inapplicable if the work was

III.     The Timing of the Relevant Property Damage

    a.     *Establishing the Time of the Property Damage According to the Initial Grant in Coverage E*

Under Coverage E, there is coverage only for property damage "which occurs during the policy period." *Ins. Policy* (Doc. 17-4), at 18.  The policy period for Policy No. Q33 6520012 ran from September 15, 1996, to September 15, 2005.  It is undisputed that the property damage at issue in the Underlying Action includes structural defects to Merlin Bush's home.  Further, the parties agree that the damage qualifies as "physical injury to or destruction of tangible property[.]" *See Pl.'s Resp. in Opp'n* (Doc. 21), at 3; *Def.'s Mot. for Summ. J.* (Doc. 19), at 7.  Consequently, it is undisputed that Simpson-Littman is seeking coverage for the first category of property damage provided under Coverage E.[12]  The dispositive question, for the purposes of summary judgment, therefore, is whether the damage to Merlin Bush's home (the cracks in the interior walls of the home, the cracks in the brick exterior and in the block and foundation, the gaps and separation between the walls and floors, the unlevel and sagging floors, and so forth) occurred before

----

performed on the insured's behalf by a subcontractor, it would not be justifiable to deny coverage to the insured, based upon the absence of an occurrence, for damages owed because of property damage to the insured's work caused by the subcontractor's work.' ... *Lee Builder's, Inc. v. Farm Bureau Mut. Ins. Co.*, 33 Kan.App.2d 504, 104 P.3d 997, 1003 (2005)." *French*, 448 F.3d at 705-06.  Applying the same reasoning articulated in *French*, the existence of the subcontractor exception in Policy No. Q33 6520012 supports the conclusion that the damage to Merlin Bush's home, arising out of the subcontractors' negligence, is the result of an "occurrence" under the policy.

[12]As noted *supra*, "**Property damage**" in Policy No. Q33 6520012 is defined as: "1. physical injury to or destruction of tangible property including loss of its use.  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; 2. loss of use of tangible property which is not physically injury or destroyed.  All such loss of use shall be deemed to occur at the time of the **occurrence** that caused it. *Ins. Policy* (Doc. 17-4), at 6 (emphasis in original).

September 15, 2005.

According to the plain language of the policy, property damage that occurs as a result of physical injury or destruction is deemed to have occurred at the time of the physical injury that caused the damage. *See Ins. Policy* (Doc. 17-4), at 6.  In other words, the date on which the property damage is deemed to have occurred is the date of the actual injury (i.e., the date the cracks appeared in the interior walls of the home, in the brick exterior, or in the block and foundation).  This finding is consistent with the language of Policy No. Q33 6520012, as well as with the case law submitted by Erie. *See, e.g., Stillwell v. Brock Bros., Inc.*, 736 F.Supp. 201, 205 (S.D. Ind. 1990) ("[T]he time an accident 'occurs' is the time when the complaining party is actually injured, not the time when the wrongful act is committed.") (applying Kentucky law); *Jenoff, Inc. v. New Hampshire Ins. Co.*, 558 N.W.2d 260, 263 (Minn. 1997) (same) (applying Minnesota law) (citing cases).  It is also consistent with the West Virginia cases cited above and the general maxim that liability policies do not provide on-going coverage, or guarantees, for injuries or damages arising out of an insured's work.  *See, e.g., Corder*, 556 S.E.2d at 82-84; *Pioneer*, 526 S.E.2d at 31-33; *see also Oxner v. Montgomery*, 794 So.2d 86, 93 (La. App. 2001) ("We find that the manifestation theory is properly applied ... under the exposure theory, an insurer would arguably remain a guarantor of its insured's actions forever.  We reject such an inequitable result.").  Plaintiff submits no argument or authority to the contrary.

Applying the so-called manifestation theory, this Court finds that the question of whether property damage occurred under Policy No. Q33 6520012 is determined by whether Merlin Bush's home was actually damaged before September 15, 2005.  The easiest way to determine when the property damage (the cracks and other structural defects) actually occurred is to ascertain when it

first appeared or was discovered.  Nonetheless, it is still the time of actual damage, not its observance, that ultimately matters.

In its memorandum supporting its motion for summary judgment, Simpson-Littman argues "[i]t is undisputed that property damage to Merlin Bush's home was identified in 2001.  Therefore, the property damage occurred during the policy period." *Pl.'s Mem. in Support* (Doc. 18), at 10. As support for this contention, Simpson-Littman submits an affidavit from Merlin Bush, in which he attests that "[t]he home was completed about June 2000 and I moved into the home about July 2000. ... Within one (1) year after moving into the above-described home, I noticed the following problems: a. Cracks in the walls throughout the interior of the home; b. Cracks in the brick on the outside of the home; c. Cracks in the block and foundation of the home; and d. Doors and windows throughout the home would not close or lock. ... In 2004, I noticed other problems in the above-described home including, but not limited to, the following: a. Gaps and separation between the walls and floors in the home; and b. Unlevel and/or sagging floors in the home." *Bush Affidavit* (Doc. 17-1), at ¶¶ 6-8.  Additionally, Mr. Bush attests that "[f]rom 2000 through 2004, various individuals came to my home to address problems I had identified such as the cracks in the walls and windows not closing." *Id.* at ¶ 9.

If the facts in Merlin Bush's affidavit are accepted as true, then the Court would find that the relevant property damage occurred during the policy period.  Therefore, in light of the conclusions rendered in the remainder of this Opinion, coverage would exist under Policy No. 6520012. However, Erie strenuously contests the factual assertions made by Simpson-Littman.

In its motion for summary judgment, Erie argues that "[i]n the complaint filed in the Underlying Lawsuit, which Merlin Bush verified under oath to be accurate, the damage was first

26

discovered in the summer of 2007, almost two years after the last policy period for the Erie Policy expired." *Def.'s Mot. for Summ. J.* (Doc. 19), at 7.  Therefore, Erie argues that the damage did not occur during the policy period and that it is entitled to summary judgment on the coverage and defense issues.  Attached to its motion, Erie submits the original, verified complaint filed in the Cabell County action, as well as the amended complaint.  Erie points out that in the original, verified complaint Merlin Bush swears that "[i]n the summer of 2007, Plaintiff *began to notice* cracks appearing throughout his home, sagging of wooden floors, and other evidence of a major structural default." *Original Compl.* (Doc. 19-1), at ¶ 7 (emphasis supplied).  Additionally, Erie notes that this statement was reiterated in the amended, non-verified complaint.[13]  *See Am. Compl.* (Doc. 19-2), at ¶ 12 ("In the summer of 2007, Plaintiff began to notice cracks appearing throughout his home, sagging of wooden floors, and other evidence of a major structural defect that had apparently existed since before Plaintiff occupied the house.").  Erie contends these documents conclusively demonstrate that "the alleged property damage in the Underlying Lawsuit did not occur during the policy period[.]"  *Def.'s Mot. for Summ. J.* (Doc. 19), at 7.

This argument, that there is no genuine issue of material fact with regard to the timing issue and the relevant property damage occurred after September 15, 2005, is based, in large part, on Erie's contention that Merlin Bush's October 22, 2009 affidavit should not be considered by this Court.  Erie submits that the affidavit should not be considered, for the purposes of summary judgment, because it is in direct conflict with the verified complaint and, as such, is subject to exclusion under the "sham affidavit doctrine."  According to Erie, the sham affidavit doctrine "is

---

[13]In the amended complaint, Merlin Bush further provides that "[a]lthough the negligence occurred before Plaintiff moved into his home, he was unable to become aware of the defects until the house *began showing signs* in 2007." *Am. Compl.* (Doc. 19-2),  at ¶ 17 (emphasis supplied).

a legal principle developed to protect the integrity of motions for summary judgment by excluding affidavits submitted by a party during the motions practice for a summary judgment motion that contradicts [sic.] the former testimony of the affiant, in an effort to create a conflict of material fact or to defeat summary judgment." *Def.'s Mot. for Summ. J.* (Doc. 19), at 12.

Erie cites *White v. Dow Chemical, Co.*, 2007 WL 6948824 (S.D. W.Va. Nov. 29, 2007), for the above proposition.  In *White*, Judge Goodwin found that a later affidavit submitted by a plaintiff, which contradicted a factual statement she made in an earlier deposition, "would likely be excludible as a 'sham affidavit' procured to defeat summary judgment after her deposition."  *White*, 2007 WL 6948824, at *4.  However, the so-called "sham affidavit doctrine" is not discussed in any more detail in *White*.  Instead, the Court found that "the plaintiff's affidavit still does not adequately identify any Dow chemical," allegedly responsible for her husband's death, and thus granted summary judgment to the company, despite the affidavit.  *Id.*

To further illustrate the "sham affidavit doctrine," and its application here, Erie cites additional cases.  First, in *Albertson v. T.J. Stevenson & Company Inc.*, 749 F.2d 223 (5th Cir. 1984), the Fifth Circuit instructs that a "nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony." *Id.* at 228.  Further, in *Williams v. J.H. Griffin* the Fourth Circuit explains that a verified complaint, which contains allegations based on personal knowledge, "is equivalent to an opposing affidavit for summary judgment purposes."  952 F.2d 820, 823 (4 th Cir. 1991) (citing *Davis v. Zahradnick*, 600 F.2d 458, 459-60 (4th Cir. 1979)).  Taken together, Erie contends these cases show that the conflict between Merlin Bush's verified complaint and his subsequently filed affidavit constitute a "sham" and should not be sufficient to defeat summary judgment.

28

The facts of the cases cited by Erie are not comparable here, however.  To begin with, in *White* the plaintiff could not identify what Dow chemical her deceased husband was exposed to. Thus, the affidavits offered by the plaintiff, at most, showed a  "mere possibility of exposure." *White*, 2007 WL 6948824, at *3.  Consequently, the decision to grant summary judgment was based upon a lack of evidence produced by the plaintiff, not simply her "sham affidavit."  *See id*. at *3-*6. Next, *McDonald v. Cabot Corporation*, 914 F.Supp. 1356 (S.D. W.Va. 1996), does not support a grant of summary judgment here.  In *McDonald,* summary judgment was granted for the defendant in an age discrimination case because the employee failed to establish a *prima facie* case under the Age Discrimination in Employment Act ("ADEA").  In reaching its decision, the *McDonald* court applied the sham affidavit rule, holding "[t]he conclusory allegations of Plaintiff's affidavit contradicting his earlier deposition testimony do not ... create a genuine issue of fact, but, at most, a sham issue of fact."  *Id.* at 1361.  However, the Court further explained that the flaw in that plaintiff's contradictory affidavit was, at least in part, the fact that "Plaintiff neither indicate[d] the source of the information [contained in the affidavit] nor supplie[d] any independent evidence to confirm it."  *Id.* at 1360.  Accordingly, the Court found the plaintiff failed to "show he [was] competent to testify on the matter or that the statement [was] based on personal knowledge."  *Id.* As a result, the Court determined that his "allegation [was] nothing more than mere conjecture." *Id.*  In reaching this conclusion, the Court cited the Fourth Circuit's decision in *Barwick v. Celotex Corporation*, 736 F.2d 946 (4th Cir. 1984), where the Circuit Court found an affidavit insufficient to establish a genuine issue of fact because "[t]he entire content of the affidavit [was] conclusory, it [did] not set forth facts of which the plaintiff has personal knowledge and it [did] not give specific facts, but only generalities."  *Id.* at 960.  The *Barwick* court explained:

If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. A genuine issue of material fact is not created where the only issue of fact is to determine which of the two versions of the plaintiff's testimony is correct.[14] *Id.* (internal quotations and citations omitted).

The instant case does not concern complicated questions of fact like those presented in *White*. To the contrary, the only factual issue presented by the parties' cross-motions for summary judgment is rather simple. When did the actual damage to Mr. Bush's home begin to occur? Mr. Bush is competent to testify as to this issue. Moreover, he has personal knowledge of the issue, as he explains in his affidavit, where he details the type of damage he observed to his home and at what times. According to the affidavit, the bulk of the damage was "noticed" between 2000 and 2004. *See Bush Affidavit* (Doc. 17-1), at ¶¶ 7-8. Further, Merlin Bush attests that he brought people to his home, to address the problems identified between 2000 and 2004, during that time period. *Id.* at ¶ 9. The affidavit statements are inconsistent with the verified complaint. However, Merlin Bush was not examined at length in any deposition. Therefore, the Court does not find that the later contradiction, to a single sentence repeated in the various complaints, as troubling as the later contradictions described in *McDonald* or *Barwick*. As a result, the Court finds that the sham affidavit doctrine does not require it to grant summary judgment to Erie based, simply, on contradictory sworn statements made by Merlin Bush, in the context of two legal actions.

Moreover, the Court finds the sham affidavit doctrine insufficient to require summary judgment in favor of Erie because Simpson-Littman does not rely upon on Merlin Bush's affidavit, alone, to establish a genuine issue of material fact with regard to timing. To the contrary, Simpson-Littman provides support for its contention that the actual damage complained of in the Underlying

---

[14]The *Barwick* plaintiff had been twice deposed by the defendants, over several days.

Action occurred prior to September 15, 2005, in the form of an affidavit and expert report produced by Professional Engineer Robert L. Wolfe. *See Wolfe Affidavit* (Doc. 21-1). In the affidavit, Mr. Wolfe attests: "It is my opinion to a reasonable degree of engineering certainty that the property damage I observed and inspected at Merlin Bush's home, occurred prior to 2005." *Id.* at ¶ 7. Attached to the affidavit, Mr. Wolfe provides his report and the reports of soil borings conducted at the Bush home-site. In the report, Mr. Wolfe details the damage to Merlin Bush's home and offers an expert opinion as to its cause. *Id.* These opinions are based upon inspections "conducted over several weeks." *Id.* Accordingly, the opinions are based upon the personal knowledge and expertise of Mr. Wolfe. The same can be said for his affidavit.

Erie has not submitted any expert report, or other evidence, countering Mr. Wolfe's conclusion that the property damage at issue "occurred prior to 2005." *Id.* at ¶ 7. Consequently, even if Merlin Bush's October 22, 2009 affidavit is disregarded, in light of the sham affidavit rule, a determination the Court finds unnecessary to draw at this point, Robert Wolfe's affidavit and expert report are sufficient to establish a genuine dispute of fact regarding when the damage to Merlin Bush's home actually occurred and, more specifically, whether the damage began to occur prior to September 15, 2005.

> b.    *The Timing Dispute Is Not Resolved (or Rendered Inconsequential) by the Combined Operation of the Completed Operations Hazard Coverage and the Subcontractor Exception*

In its response in opposition to Plaintiff's motion, Erie specifically argues that coverage is not available here because the period of coverage for "completed operations hazard" claims is the same as for the policy as a whole. In a CGL policy, "[t]he 'completed operations hazard' coverage applies to collateral property damage or personal injury caused by an occurrence 'arising out of your

31

work that has been completed or abandoned.'" *Pioneer*, 526 S.E.2d at 33 (quoting the relevant policy).  For example, "completed operations hazard" claims include coverage for a plaintiff who slips and falls in the completed section of a golf clubhouse, or for a child who is killed when a cinder block wall collapses and falls on him.  *Id.* (citations omitted).  Consistent with the purposes of an occurrence-based CGL policy, however, "[t]he products hazard and completed operations provisions are not intended to cover damage to the insured's products or work project out of which an accident arises."  *Id.*  In other words, the coverage is not a never-ending guarantee of the insured's work.  To the contrary, "[t]he risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, *and for which the insured may be found liable*."  *Id.* (emphasis supplied).

Under a CGL policy, damage "for which the insured may be found liable" must occur during the policy period.  Accordingly, damage for which "completed operations hazard" coverage exists also must occur during the policy period.  *See Culp v. Erie Ins. Exchange*, 2000 WL 1844641, at * 5 (N.D. W.Va. Nov. 16, 2000) (holding that completed operations hazard coverage is in effect only so long as the policy itself is in effect) ("Insurance contracts commonly provide coverage for specified periods of time.  An insured would expect to find a time limitation expressed in the policy, and would not reasonably assume, after reading only the completed operations definition, that he could cease paying premiums but enjoy completed operations coverage indefinitely.") (quoting *Travelers Ins. Co. v. C.J. Gayfer's*, 366 So.2d 1199, 1201 (Fla. 1979)); *see also Corder*, 556 S.E.2d at 81 (holding that completed operations hazard coverage under a CGL policy is subject to the same restrictions as coverage under the policy's initial grant) ("Before any coverage can be found to exist

32

under the 'products-completed operations hazard,' or any other portion of the commercial general liability policy, an 'occurrence,' within the policy definition of that term, must be determined to have occurred.").  Therefore, because the "completed operations hazard" provision in Policy No. Q33 6520012 only provided coverage to Simpson-Littman so long as the policy was in effect, the determinative issue in this case remains the question raised above: whether the property damage complained of in the Underlying Action occurred during Simpson-Littman's policy period.  There is a dispute of material fact regarding this question. As a result, summary judgment is not appropriate, at this juncture, notwithstanding the existence of "completed operations hazard" coverage, or the subcontractor exception to Policy No. Q33 6520012's "your work" exclusion.

**Conclusion**

For the foregoing reasons, Defendant Erie Insurance Property and Casualty Insurance Company's Motion for Summary Judgment is **DENIED** and Plaintiff Simpson-Littman Construction, Inc.'s Motion for Summary Judgment is **DENIED**.  In so ruling, the Court notes that there is no current Scheduling Order, and therefore the parties will submit a supplementary 26(f) report within 14 days.  The Court **SETS** a Scheduling Conference at 10:30 AM on October 4, 2010.  The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        September 13, 2010

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE